1   James M. Dombroski  (No. 56898)
    LAW FIRM OF JAMES M. DOMBROSKI
2   P.O. Box 751027
    Petaluma, CA 94975-1027
3   Telephone:  (707) 762-7807
    Facsimile:   (707) 769-0419
4   E-mail:  jdomski@aol.com

5   Jeffery K. Perkins (No. 57996)
    LAW OFFICES OF JEFFERY K. PERKINS
6   1275 Columbus Avenue
    San Francisco, CA  94133
7   Telephone:  415-474-3833
8   Facsimile: 415-474-2890
    E-mail:  jefferykperkins@aol.com
9
    LAW OFFICES OF JOHN H. BOONE
10  John H. Boone, SBN 44876
    555 California Street, Suite 3160
11  San Francisco, CA 94104
    Telephone: (415) 434-1133
12  Facsimile: (415) 434-9200
    E-mail: jboone@dc.rr.com
13
14  [ADDITIONAL COUNSEL APPEAR ON LAST PAGE]

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18  IN RE TFT (FLAT PANEL)         )  Case No.
    ANTITRUST LITIGATION:          )
19                                 )  Related Case:
    INDIRECT PURCHASER ACTIONS     )  Master File No.  M 07-1827 SI
20                                 )
                                   )  MDL. No. 1827
21  EDWARD LAWRENCE, JERRY         )
    McCLEERY, SHELLEY JEAN PECK    )  CLASS ACTION
22  and ROC HUTCHISON,             )
                                   )  COMPLAINT FOR DAMAGES FOR
23              Plaintiffs,        )  ANTITRUST VIOLATIONS
                                   )
24  vs.                            )  JURY TRIAL DEMANDED
                                   )
25  LG PHILLIPS LCD CO., LTD., et al.,  )
                                   )
26              Defendants.        )
                                   )
27                                 )
                                   )
28

C 07 4764

Plaintiffs, indirect purchasers of thin film transistor liquid crystal display products ("TFT-LCD Products" or "Flat Panel Products"), on behalf o f themselves and all other similarly situated indirect purchasers, who are the members of the class defined herein, for their Complaint against defendants named herein, demand trial by jury of all claims properly triable thereby and complain and allege as follows:

## NATURE OF THIS ACTION

1.     This is an action brought under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to secure equitable relief against the defendants' violations  of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and under the antitrust laws of the State of California to recover damages and secure other relief against the defendants for violations of those laws.  The defendants named herein are the leading manufacturers of Flat Panel Products, which are used in televisions, both desktop and notebook computer monitors, mobile phones, personal digital assistants, and other products.  Since at least January 1, 1998, through at least December 31, 2005 ("the  Class Period"), defendants have agreed, combined, and conspired to raise, fix, peg, and stabilize prices for Flat Panel Products sold in the United States and in the State of California.  As a proximate result of defendants' price fixing conspiracy, plaintiffs have been injured in their business and property by paying more for Flat Panel Products than plaintiffs otherwise would have paid in the absence of defendants' conspiracy.  Plaintiffs bring this acti on to recover the overcharges they have paid, to enjoin the continuation of defendants' conspiracy, and to obtain such other and further relief to which they may be entitled.

## JURISDICTION

2.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims asserted in this action under 28 U.S.C. §§ 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5 million exclusive of interest and costs, members of the plaintiff class are citizens of the State of California and the state claims are so related to

2

1 the federal antitrust claims as to form part of the same case or controversy under Article III

2 of the United States Constitution.

3                                          **PARTIES**

4     **Plaintiffs**

5         3.     The named plaintiffs and class representatives in these consolidated actions

6 are all indirect purchasers in the State of California of Flat Panel Products manufactured

7 and sold by one or more of the defendants named herein or their unnamed co-conspirators

8 pursuant to the price fixing conspiracy alleged herein during the Class Period.  The named

9 Plaintiffs and class representatives are as follows:

10            (a)     Jerry McCleery, who resides in Palm Springs, California, bought a

11 flat screen television;

12            (b)     Shelley Jean Peck, who resides in Cathedral City, California, bought

13 a flat screen television;

14            (c)     Edward Lawrence, who resides in Tiburon, California, bought a flat

15 screen television;

16            (d)     Roc Hutchison, who resides in Rohnert Park, California, bought a flat

17 screen television.

18     **Defendants**

19         4.     Defendant LG.PHILIPS LCD CO., LTD. ("LG. PHILIPS") is a Korean

20 entity with its principal place of business at 20 Yoido-dong, Youngdungpo-su, Seoul 150-

21 721, Republic of Korea.  Defendant LG.Philips is a joint venture created in 1999 by LG

22 Electronics and Royal Philips Electronics NV.  LG.Philips maintains sales offices in

23 California, Illinois, North Carolina and Texas.  LG.Philips "is the globa l leader in the

24 development and manufacture of TFT-LCD panels for televisions, monitors, notebooks and

25 emerging mobile applications."  ( < http://www.lgphilips-

26 lcd.com/homeContain/jsp/eng/com /com310_j_e.jsp > ).  During the Class Period,

27 LG.Philips manufactured, sold and distributed TFT-LCD Products to customers throughout

28 the United States.

                                                                                         3

1        5.    Defendant LG.PHILIPS LCD AMERICA, INC. is a business entity

2    organized under the laws of California with its principal place of business at 150 East

3    Brokaw Rd., San Jose, California. LG.Philips America, Inc. is a wholly-owned and

4    controlled subsidiary of LG.Philips LCD Co., Ltd. During the Class Period, LG.Philips

5    LCD America, Inc. manufactured, sold and distributed TFT-LCD Products to customers

6    throughout the United States.

7        6.    Defendants LG.Philips LCD Co., Ltd. and LG.Philips LCD America, Inc.

8    are referred to collectively herein as "LG.Philips ."

9        7.    Defendant SAMSUNG ELECTRONICS COMPANY LTD. is a Korean

10   company with its principal place of business at Samsung Main Building 250-2 ga,

11   Taepyung-ro Chung-gu, Seoul, Korea. During the Class Period, Samsung Electronics

12   Company Ltd. manufactured, sold and distributed TFT-LCD Products to customers

13   throughout the United States.

14       8.    Defendant SAMSUNG ELECTRONICS AMERICA, INC. is a company

15   organized under the laws of New York with its principal place of business at 105 Challenger

16   Road, Ridgefield Park, New Jersey. Samsung Electronics America, Inc. is a wholly-owned

17   and controlled subsidiary of defendant Samsung Electronics Company Ltd. During the

18   Class Period, Samsung Electronics America, Inc. sold and distributed TFT-LCD Products

19   to customers throughout the United States.

20       9.    Defendants Samsung Electronics Company Ltd. and Samsung Electronics

21   America, Inc. are referred to collectively herein as "Samsung."

22       10.    Defendant SHARP CORPORATION is a Japanese company with its principal

23   place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. During the

24   Class Period, Sharp Corporation manufactured, sold and distributed TFT-LCD Products to

25   customers throughout the United States.

26       11.    Defendant SHARP ELECTRONICS CORPORATION is a company

27   organized under the laws of New York with its principal place of business at Sharp Plaza,

28   Mahwah, New Jersey. Sharp Electronics Corporation is a wholly-owned and controlled

4

1   subsidiary of Sharp Corporation. During the Class Period, Sharp Electronics Corporation

2   manufactured, sold and distributed TFT-LCD Products to customers throughout the United

3   States.

4       12.    Defendants Sharp Corporation and Sharp Electronics Corporation are

5   referred to collectively herein as "Sharp."

6       13.    Defendant TOSHIBA CORPORATION ("Toshiba") is a Japanese company

7   with its principal place of business at 1-1 Shibaura, 1-chome Minato-ku, Tokyo 105-8001,

8   Japan. During the Class Period, Toshiba Corporation manufactured, sold and distributed

9   TFT-LCD Products to customers throughout the United States.

10      14.    Defendant MATSUSHITA ELECTRIC INDUSTRIAL CO. is a Japanese

11  company with its principal place of business at 1006 Oaza Kadoma, Kadoma City, Osaka

12  571-8501, Japan. During the Class Period, Matsushita Electric Industrial Co.

13  manufactured, sold and distributed TFT-LCD Products to customers throughout the United

14  States.

15      15.    Defendant PANASONIC CORPORATION OF NORTH AMERICA,

16  formerly known as Matsushita Electric Corp. of America, is a company organized under the

17  laws of Delaware with its principal place of business at 1 Panasonic Way, Secaucus, New

18  Jersey. Panasonic Corporation of North America is a wholly-owned and controlled

19  subsidiary of Matsushita Electric Industrial Co. During the Class Period, Panasonic

20  Corporation of North America manufactured, sold and distributed TFT-LCD Products to

21  customers throughout the United States.

22      16.    Defendants Matsushita Electric Industrial Co. and Panasonic Corporation of

23  North America are referred to collectively herein as "Matsushita."

24      17.    Defendant TOSHIBA MATSUSHITA DISPLAY TECHNOLOGY CO.,

25  LTD. ("Toshiba Matsushita") is a Japanese company with its principal place of business at

26  Rivage Shinagawa, 1-8 Konan 4-chome, Minato-ku, Tokyo 108-0075, Japan. Toshiba

27  Matsushita also maintains sales offices in California, Illinois and North Carolina.

28  According to its web site, Toshiba Matsushita is "positioned as one of the world leaders in

5

1  the LCD market" and " a leading company in the mobile display field."

2  (< http://www.tmdisplay.com/tm_dsp/en/profile/power.html >).  During the Class Period,

3  Toshiba Matsushita Display Technology Co., Ltd. manufactured, sold and distributed TFT-

4  LCD Products to customers throughout the United States.

5      18.    Defendant HITACHI, LTD. is a Japanese company with its headquarters at

6  6-6 Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  During the Class Period,

7  Hitachi Ltd. manufactured, sold and distributed TFT-LCD Products to customers

8  throughout the United States.

9      19.    Defendant HITACHI AMERICA LTD. is a company organized under the

10  laws of New York, with its principal place of business at 50 Prospect Avenue, Tarrytown,

11  New York.  Hitachi America Ltd. is a wholly-owned and controlled subsidiary of defendant

12  Hitachi Ltd.  During the Class Period, Hitachi America Ltd. manufactured, sold and

13  distributed TFT-LCD Products to customers throughout the United States.

14      20.    Defendant HITACHI DISPLAYS, LTD. is a Japanese company with its

15  principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku, Tokyo,

16  101-0022, Japan.  As stated on its web site, "[i]n 2002, all the departmen ts . . . concerned

17  with the display business of Hitachi, Ltd. were spun off into a separate company called

18  Hitachi Displays, Ltd.  As a specialized display manufacturer, Hitachi Displays, Ltd. aims

19  to contribute globally by providing the world's best displays."  (< ht tp://www.hitachi-

20  displays.com/en/company/outline/ >).  During the Class Period, Hitachi Displays, Ltd.

21  manufactured, sold and distributed TFT-LCD Products to customers throughout the United

22  States.

23      21.    Defendant HITACHI ELECTRONIC DEVICES (USA), INC. is a company

24  organized under the laws of Delaware with its principal place of business at 575 Mauldin

25  Road, Greenville, South Carolina.  Hitachi Electronic Devices (USA), Inc. is a wholly-

26  owned and controlled subsidiary of Hitachi Ltd.  During the Class Period, Hitachi

27  Electronic Devices (USA), Inc. manufactured, sold and distributed TFT-LCD Products to

28  customers throughout the United States.

1       22.    Defendants Hitachi Ltd., Hitachi Displays, Ltd., Hitachi America Ltd. and

2  Hitachi Electronic Devices (USA), Inc. are referred to collectively as "Hitachi."

3       23.    Defendant IPS ALPHA TECHNOLOGIES, LTD. ("IPS Alpha") is a

4  Japanese entity with its principal place of business at 3732 Hayano, Mobara-city, Chiba

5  Prefecture, Japan.  IPS Alpha was formed in 2004 as a joint venture between Hitachi

6  Displays, Ltd., Toshiba Corporation and Matsushita Electric Industrial Co., Ltd.  During

7  the Class Period, IPS Alpha manufactured, sold and distributed TFT-LCD Products to

8  customers throughout the United States.

9       24.    Defendant EPSON IMAGING DEVICES CORPORATION ("Epson

10  Imaging") is a Japanese company with its principal place of business at 6925 Toyoshina

11  Tazawa, Azumino-shi, Nagano, Japan.  According to its web site, Epson Imaging Devices

12  Corporation, formerly known as Sanyo Epson Imaging Devices Corporation, was originally

13  established as a joint venture between Seiko Epson Corporation and Sanyo Electric Co.,

14  Ltd.  The company commenced operations in October 2004 and on December 28, 2006,

15  changed its name upon becoming a wholly-owned Epson subsidiary.  (<http://www.epson-

16  imaging.com/e/company/outline/>).  During the Class Period, Epson Imaging

17  manufactured, sold and distributed TFT-LCD Products to customers throughout the United

18  States.

19       25.    Defendant NEC CORPORATION is a Japanese company with its principal

20  place of business at 7-1, Shiba 5-chome, Minato-ku, Tokyo, 108-8001, Japan.  During the

21  Class Period, NEC Corporation manufactured, sold and distributed TFT-LCD Products to

22  customers throughout the United States.

23       26.    Defendant NEC LCD TECHNOLOGIES, LTD. is a Japanese company with

24  its principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kangawa,

25  211-8666, Japan.  NEC LCD Technologies, Ltd. is a wholly-owned and controlled

26  subsidiary of NEC Corporation.  During the Class Period, NEC LCD Technologies, Ltd.

27  manufactured, sold and distributed TFT-LCD Products to customers throughout the United

28  States.

7

27.     Defendant NEC ELECTRONICS CORPORATION is a Japanese company with its principal place of business at 1753 Shimonumabe, Nakahara-Ku, Kawasaki, Kanagawa, 211-8668, Japan.  During the Class Period, NEC Electronics Corporation manufactured, sold and distributed TFT-LCD Products to customers throughout the United States.

28.     Defendant NEC ELECTRONICS AMERICA, INC. is a company organized under the laws of California with its principal place of business at 2880 Scott Boulevard, Santa Clara, California.  NEC Electronics America, Inc. is a wholly-owned and controlled subsidiary of NEC Electronics Corporation.  During the Class Period, NEC Electronics America, Inc. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States.

29.     Defendant NEC DISPLAY SOLUTIONS OF AMERICA, INC. is a company organized under the laws of Delaware with its principal place of business at 500 Park Blvd., Itasca, Illinois.  NEC Display Solutions of America, Inc. is a wholly-owned and controlled subsidiary of NEC Electronics Corporation.  During the class period, NEC Display Solutions of America, Inc. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States.

30.     Defendants NEC Corporation, NEC Electronics Corporation, NEC LCD Technologies, Ltd., NEC Electronics America, Inc. and NEC Display Solutions of America, Inc. are referred to collectively herein as "NEC."

31.     Defendant IDT INTERNATIONAL LTD. is an entity organized under the laws of Bermuda with its principal place of business at Block C, 9th Floor, Kaiser Estate Phase 1, 41 Man Yue Street, Hunghom, Kowloon, Hong Kong.  During the Class Period IDT International Ltd. manufactured, sold and distributed TFT-LCD Products to customers throughout the United States.

32.     Defendant OREGON SCIENTIFIC, INC. is a company organized under the laws of Oregon with its principal place of business at 19861 SW 9th Avenue, Tualatin, Oregon.  Oregon Scientific, Inc. is a wholly-owned and controlled subsidiary of IDT

8

1    International Ltd.  During the Class Period, Oregon Scientific, Inc. manufactured, sold and

2    distributed TFT-LCD Products to customers throughout the United States.

3         33.    Defendant CHI MEI OPTOELECTRONICS CORPORATION ("Chi Mei")

4    is a Taiwanese company with its principal place of business at No. 3, Sec. 1, Huanshi

5    Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147 Taiwan.

6    During the Class Period, Chi Mei manufactured, sold and distributed TFT-LCD Products to

7    customers throughout the United States.

8         34.    Defendant CHI MEI OPTOELECTRONICS USA, INC. is a company

9    organized under the laws of Delaware with its principal place of business at 101 Metro

10   Drive, Suite 510, San Jose, California.  Chi Mei Optoelectronics USA, Inc. is a wholly-

11   owned and controlled subsidiary of Chi Mei Optoelectronics Corporation.  During the Class

12   Period, Chi Mei Optoelectronics USA, Inc. manufactured, sold and distributed TFT-LCD

13   Products to customers throughout the United States.

14        35.    Defendant INTERNATIONAL DISPLAY TECHNOLOGY CO., LTD.

15   ("International Display") is a Japanese company with its principal place of business at

16   Nasei Yaesu Bldg., 3F, 2-2-10 Yaesu, Chuo-Ku, Tokyo 104-0228, Japan.  International

17   Display is a subsidiary of defendant Chi Mei Optoelectronics Corporation.  During the

18   Class Period, International Display Technology Co., Ltd., manufactured, sold and

19   distributed TFT-LCD Products to customers throughout the United States.

20        36.    Defendant INTERNATIONAL DISPLAY TECHNOLOGY USA INC. is a

21   company with its principal place of business at 101 Metro Drive, Suite 510, San Jose,

22   California.  International Display Technology USA Inc. is a subsidiary of defendant Chi

23   Mei Optoelectronics Corporation,  During the Class Period, International Display

24   Technology USA Inc. manufactured, sold and distributed TFT-LCD Products to customers

25   throughout the United States.

26        37.    Defendant AU OPTRONICS is a Taiwanese company with its principal place

27   of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park, Hsinchu 30078, Taiwan.

28

9

1  During the Class Period, AU Optronics manufactured, sold and distributed TFT-LCD

2  Products to customers throughout the United States.

3       38.    Defendant AU OPTRONICS CORPORATION AMERICA ("AUOCA") is a

4  company organized under the laws of California with its principal place of business at 9720

5  Cypresswood Drive, Suite 241, Houston, Texas. AUOCA is a wholly-owned and

6  controlled subsidiary of AU Optronics. AUOCA also maintains a facility in San Diego,

7  California. During the Class Period, AUOCA manufactured, sold and distributed TFT-

8  LCD Products to customers throughout the United States.

9       39.    Defendant CHUNGWA PICTURE TUBES LTD. ("Chungwa") is a

10  Taiwanese company with its principal place of business at 1127 Hopin Road, Padeh City,

11  Taoyuan, Taiwan. During the Class Period, Chungwa manufactured, sold and distributed

12  TFT-LCD Products to customers throughout the United States.

13       40.    Defendant HANNSTAR DISPLAY CORPORATION ("HannStar") is a

14  Taiwanese company with its principal place of business at No. 480, Rueiguang Road, 12th

15  Floor, Neihu Chiu, Taipei 114, Taiwan. During the Class Period, HannStar manufactured,

16  sold and distributed TFT-LCD Products to customers throughout the United States.

17       **CO-CONSPIRATORS**

18       41.    Various persons and entities, whose identities are at this time unknown to

19  plaintiffs, may have participated as co-conspirators in the violations alleged herein and

20  performed acts and made statements in furtherance thereof. When and if plaintiffs learn the

21  identities of such co-conspirators, plaintiffs may seek leave to amend this complaint to said

22  such co-conspirators as defendants.

23       **CLASS ACTION ALLEGATIONS**

24       42.    Plaintiffs bring this action as a class action pursuant to Rules 23(b)(2) and

25  23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a plaintiff

26  class ("the Class") composed of and defined as follows:

27       All persons and entities residing in the United States who, from January 1, 1998
        through December 31, 2005, purchased TFT-LCD Products in the United States
28       indirectly from the Defendants for their own use and not for resale. Specifically

                                                                                    10

excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

43.    Plaintiffs do not know the exact size of the Class because such information is in the exclusive control of the defendants. The nature of trade and commerce involved, however, is so substantial that the Class necessarily includes at least thousands of members and is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable.

44.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs indirectly purchased Flat Panel Products from one or more of the defendants or their co-conspirators; plaintiffs' claims arise from the same course of conduct by defendants as the course of conduct giving rise to the claims of the Class; and the relief sought is common to the Class.

45.    There are questions of law or fact common to the Class, including but not limited to the following:

a.    Whether defendants engaged in a contract, combination, and/orconspiracy to fix, raise, maintain, or stabilize prices of Flat Panel Products sold in the United States and in the State of California;

b.    Whether defendants' conduct caused the prices of Flat Panel Products sold in the United States and in the State of California to be at artificially high and noncompetitive levels;

c.    The amount of such overcharge and enhancement of prices for Flat Panel Products;

d.    Whether plaintiffs and the other members of the Class were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members;

11

1          e.      Whether the defendants' conduct has violated Section 1 of the

2    Sherman Act;

3          f.      Whether the defendants' conduct has violated Sections 16720 and

4    17200 of the California Business and Professions Code;

5          g.      Whether the defendants' conduct has violated the antitrust, unfair

6    competition, and consumer protection laws of the State of Califonria under which claims are

7    asserted herein; and

8          h.      Whether plaintiffs and the Class are entitled to, among other things,

9    injunctive relief.

10    46.    The questions of law and fact common to individual class members set forth

11    in the foregoing paragraph predominate over any questions of law or fact affecting only

12    individual class members.

13    47.    The named plaintiffs will fairly and adequately protect the interests of the

14    Class in that the named plaintiffs have no interests antagonistic to the interests of the other

15    members of the Class and have retained counsel competent and experienced in the

16    prosecution of class actions and antitrust cases to represent themselves and the Class.

17    48.    A class action is superior to other available methods for the fair and efficient

18    adjudication of this litigation.  Individual joinder of all class members is impracticable.  The

19    damages sustained by individual class members are likely to be sufficiently small that

20    individual class members will be unable and unwilling to bear the expense, time, and

21    burden of maintaining their own individual actions.  If this case does not proceed as a class

22    action, defendants will thus be able to retain the fruits of their unlawful conduct and avoid

23    compensating the victims.  If individual class members were to bring their own actions, the

24    court system would be greatly burdened with the administration and trial of such a large

25    number of cases.  Individual actions would also present the possibility of inconsistent or

26    contradictory results, while greatly increasing the delay and expense for the parties and the

27    judicial system.  All of these difficulties can be avoided by allowing this action to proceed

28    as a class action.

12

49.    This case is also appropriate for certification as a class action because the defendants have acted and refused to act on grounds generally applicable to the Class, so that final injunctive relief will be appropriate with respect to the Class as a whole.

50.    The claims asserted herein are also appropriate for class certification under the laws of the state of California and of the other states under which claims are asserted.

## NATURE OF TRADE AND COMMERCE

51.    Throughout the Class Period, each defendant sold Flat Panel Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce.

52.    Throughout the Class Period, defendants collectively controlled a significant share of the market for Flat Panel Products, both globally and in the United States.

53.    The defendants' conspiracy to fix the price of Flat Panel Products substantially affected interstate trade and commerce.

54.    Flat Panel Products are a major application of TFT-LCD technology, which was first invented in the 1960s and thereafter developed for commercial use in laptop computers by 1991. TFT-LCD or Flat Panel Products use liquid crystal to control the passage of light. More specifically:

> The basic structure of a TFT-LCD panel may be thought of as two glass substrates sandwiching a layer of liquid crystal. The front glass substrate is fitted with a color filter, while the back glass substrate has transistors fabricated on it. When voltage is applied to a transistor, the liquid crystal is bent, allowing light to pass through to form a pixel. A light source is located at the back of the panel and is called a backlight unit. The front glass substrate is fitted with a color filter, which gives each pixel its own color. The combination of these pixels in different colors forms the image on the panel.

> No matter how the design of the TFT panel has been changed or modified, its structures have to contain TFT devices and LC control region (ITO film for transmissive type of LCD, metal such as Al is used for reflective type of LCD).

13

1   ( <http://www.auo.com/auoDEV/technology.php?sec=tftIntro&Is=en> ).

2        55.   TFT-LCD technology offers numerous benefits over traditional

3   cathode-ray tube (CRT) technology and is used in a wide range of consumer products,

4   including laptop and desktop computer monitors, televisions, cell phones, and any number

5   of portable electronic devices.  ( <http://www.lgphilips-led.com/homeContain/jsp/eng/tech/

6   tech210_02_j_e.jsp> ).  Defendant LG.PHILIPS describes the applications for TFT-LCD

7   technology as follows:

8        TFT-LCD technology has created a wide range of computer and consumer
products that would have not been possible with cathode-ray tubes (CRT).
9   The flat and thin attributes of LCDs makes them ideal for mobile or portable
applications.  In addition, LCDs can operate at low voltage levels and
10  dissipate with low heat exposure.  Initially, LCDs were incorporated into
notebook computers, similar in size and resolution to 12-14 inch CRT
11  monitors.  Through innovation, TFT-LCD engineers were able to develop
displays providing much higher resolution than CRTs, in addition to
12  producing them in larger sizes.  Today, TFT-LCDs are challenging CRT-
based desktop computer monitors.  As a result, a wider range of mobile
13  computing applications are now available.  Engineers have found ways to
reduce weight, thickness, and the frame width of notebook computer
14  displays.  New TFT process technologies make it possible to deliver more
pixels per inch and allow even portable computers to display more
15  information than the latest CRT monitor.  Such technology became available
just as DVDs became popular, so consumers can now get DVD players in
16  very thin and light packages.  Currently, a similar transformation is
occurring with next-generation cell phones and wireless networks.
17

18

19  *Id.*

20

21       56.   There are significant manufacturing and technological barriers to entry in the

22  TFT-LCD or Flat Panel industry.  A state-of-the-art fabrication plant can cost upwards of

23  $2 billion, and changing technology requires constant research and development investment.

24  ( <http://sst.pennnet.com/articles/article_display.cfm?Article_ID=215221&CFID=196357

25  50&CFTOKEN=54020961> ).  There have been at least eight generations of Flat Panel

26  Products, each requiring significant new investment.  Samsung's Novem ber 3, 2005

27  "Market Perspective & Strategy" presentation, available at its website, details some of

28  these high barriers to entry.

14

1  (<http://www.samsung.com/AboutSAMSUNG/ELECTRONICSGLOBAL/InvestorRelatio
2  ns/IREventsPresentations/downloads/analyst_20051104_1000.pdf>).

3      57.    The market for Flat Panel Products is huge. An October 10, 2006, article
4  stated that "[m]anufactu rers are expected to pump out 48.4 million LCDs for TVs this year
5  alone, up 70 percent over 2005, while flat-panel sales – most of those using LCD
6  technology – are expected to reach $US 88 billion this year and $US 100 billion in 2007,
7  according to market research company DisplaySearch."
8  (<http://www.theage.com/au/news/home-theatre/they-are-building-it-but-will-lcd-sales-
9  come/2006/10/09/1160246068541.html#>).

10     58.    The market for the manufacture and sale of Flat Panel Products is conducive
11 to the type of collusive activity alleged here. The market is oligopolistic and highly
12 concentrated. According to data from iSuppli, in 2005, LG Philips had 21.4% of the large
13 Flat Panel global market share, Samsung had 20.9%, AU Optronics had 14.5%, Chi Mei
14 had 11.8%, and Chunghwa had 7.3%, while the remaining suppliers controlled 24.1%.
15 (<http://www.eetimes.com/showArticle.jhtml?_articleID=177101936>). Samsung took
16 over the leading position in the industry in 2006.
17 (<http://biz.yahoo.com/rb/061211/lgphilips_investigation.html?.v=2>).

18     59.    The Flat Panel Products industry has experienced significant consolidation
19 during the Class Period, as reflected by AU Optronics' acquisit ion of Quanta Display, the
20 creation in 2001 of AU Optronics itself through the merger of Acer Display and Unipac
21 Electronics, and Fujitsu Limited's transfer of its LCD business to Sharp in 2005. Other
22 industry consolidation includes the merger of the LCD operations of defendants Toshiba and
23 Matsushita into one entity, defendant Toshiba Matsushita Display Co., Ltd., in 2002.
24 (<http://www.toshiba.com/taec/news/press_releases/2002/to-188.jsp.>).

25     60.    There is a great deal of cross-licensing and many cooperative arrangements
26 in the Flat Panel industry, creating additional opportunities for collusive activity. By way
27 of example, defendant Chi Mei has licensing arrangements with defendants Sharp, AU
28

15

1   Optronics, Chungwa, HannStar, and Hitachi.  During the Class Period, AU Optronics also
2   entered into licensing agreements with Sharp and Samsung.

3        61.    Other cooperative arrangements include joint ventures, which are common
4   throughout the industry.  For example, defendant IPS Alpha was formed in 2004 as a joint
5   venture among defendants Hitachi, Toshiba, and Matsushita.

6        62.    A number of the defendants, including Samsung, Hitachi, NEC, Seiko
7   Epson, Sharp, and Toshiba, have entered into price-fixing arrangements in other closely
8   related industries similar to the price-fixing agreement alleged herein.  Such industries
9   include the manufacture of dynamic random access memory ("DRA M") computer chips
10  and static random access memory ("S RAM") computer chips.  Both the DRAM and SRAM
11  industries are oligopoly industries dominated by many of the same defendants as in the Flat
12  Panel industry, which has a similar oligopoly structure.  The defendants' entry into express
13  price-fixing agreements in the DRAM and SRAM industries demonstrates that the oligopoly
14  structure of those industries and conscious parallelism alone have been insufficient to
15  achieve price uniformity, and that actual agreement among the market participants has been
16  necessary to achieve price uniformity.  Such evidence tends to exclude the possibility that
17  price uniformity in the TFT-LCD industry, which is similar to the DRAM and SRAM
18  industries and includes the same players, has resulted from conscious parallelism, and not
19  from actual agreement.

20       63.    Flat Panel Products have no independent utility, and have value only as
21  components of other products such as televisions, computer monitors, cell phones, and
22  other portable electronic devices.  The demand for Flat Panel Products thus directly derives
23  from the demand for these other products in which Flat Panel Products are components.

24       64.    Flat Panel Products are commodity products, with functionally equivalent
25  products available from the defendants, which manufacture Flat Panel Products pursuant to
26  standard specifications and sizes established by the defendants and original equipment
27  manufacturers of the finished products incorporating Flat Panel Products.

28

16

65.    Flat Panel Products are identifiable, discreet physical objects that do not change form or become an indistinguishable part of the televisions, computer monitors, or other products in which Flat Panel Products are a component.

66.    Once a Flat Panel Product leaves the place of manufacture, it remains essentially unchanged as it moves through the distribution system, whether installed in a television, computer monitor, cell phone, or other product.

67.    Televisions, computers, cell phones, and other electronics products clearly display their Flat Panel Products, which, except for wear and tear, are essentially identical to what left the factory.

68.    Thus, Flat Panel Products follow a traceable physical chain from the defendants to the original equipment manufacturers of televisions, etc., to the purchasers of the finished products incorporating Flat Panel Products.

69.    The Flat Panel Products market is comprised of four simple segments: those that make the Flat Panel Products (the defendants); those that purchase Flat Panel Products from defendants for resale as components of televisions, computers, cell phones, etc.; intermediate resellers, who purchase products containing Flat Panel Products for resale (indirect purchaser resellers); and those that purchase products containing Flat Panel Products for their own use (the indirect purchasers).

70.    The market for Flat Panel Products and the market for products incorporating Flat Panel Products are intimately connected, and can be considered different stages of a single market supply chain.

71.    Direct purchasers of Flat Panel Products buy Flat Panel Products in order to incorporate them as components of televisions, computers, cell phones, and other electronic products.  Defendants' largest direct customers are the  manufacturers of televisions, desktop and laptop computers and computer monitors, and cell phones.  These customers and other smaller manufacturers are called original equipment manufacturers or "OEMs."

72.    The price of Flat Panel Products has a direct effect on the price of products containing Flat Panel Products as components.  The margins for OEMs are sufficiently

17

1   thin that price increases of Flat Panel Products force OEMs to increase the prices of their

2   products. Correspondingly, defendants closely track the Flat Panel Products needs of

3   OEMs for purposes of determining their own production allotments and forecasts.

4       73.    The indirect purchaser buys Flat Panel Products through one of two

5   distribution chains: either from the direct purchaser OEM, or through a reselling

6   intermediary such as a retailer.

7       74.    OEMs and intermediate resellers of products incorporating Flat Panel

8   Products as components are all subject to vigorous price competition, whether selling

9   televisions, computers, cell phones, or other electronics products. The demand for Flat

10  Panel Products is ultimately determined by purchasers of products with Flat Panel Products

11  as components. The market for Flat Panel Products and the market for products in which

12  Flat Panel Products are components are therefore inextricably linked and cannot be

13  considered separately. Defendants are well aware of this intimate relationship, and use

14  forecasts of televisions, computers, cell phones, etc., to predict sales of Flat Panel

15  Products.

16      75.    OEMs and intermediate resellers are all subject to vigorous price competition

17  and have very thin net margins. They are therefore at the mercy of their component costs,

18  such that increases in component costs, specifically the price of Flat Panel Products, lead to

19  quick corresponding price increases at the OEM and reseller levels for products with Flat

20  Panel Products as components.

21      76.    Flat Panel Products are one of the most expensive components in products in

22  which they are incorporated. Because of their thin margins, OEMs and intermediate

23  resellers cannot absorb any part of the cost of Flat Panel Products.

24      77.    For example, the computer industry is highly competitive. Computers are

25  commodities, with little or no brand loyalty, such that aggressive pricing causes consumers

26  to switch preferences to different brands. Computer prices are closely based on production

27  costs, which are in turn directly determined by component costs, since assembly costs are

28  minimal. OEMs accordingly use component costs, like the cost of Flat Panel Products,

18

1   as the starting point for all price calculations. Thus, computer prices closely track to

2   increases and decreases in component costs, specifically the cost of Flat Panel Products.

3       78.    Just as Flat Panel Products can be physically traced through the supply chain,

4   so can their price be traced to show that changes in the prices paid by direct purchasers of

5   Flat Panel Products affect prices paid by indirect purchasers of Flat Panel Products.

6       79.    The market for Flat Panel Products and the market for products with Flat

7   Panel Products as components are inextricably linked and intertwined simply because the

8   Flat Panel Product market exists to serve the market for products incorporating Flat Panel

9   Products. The market for Flat Panel Products and the market for products incorporating

10  Flat Panel Products are, for all intents and purposes, inseparable in that one cannot exist

11  without the other.

12      80.    The defendants' conspiracy, the purpose of which has been to raise the price

13  of Flat Panel Products, has directly increased the prices of products containing Flat Panel

14  Products as components.    ·

15      81.    The more pricing decisions are based on costs, the easier it is to determine

16  whether and to what extent increases in component costs are passed through to subsequent

17  purchasers. In addition, increases in direct costs will be passed through sooner and at a

18  higher rate than increases in indirect costs. Here, the cost of Flat Panel Products is a direct

19  cost to direct purchasers.

20      82.    Plaintiffs and other indirect purchasers have participated in the market for the

21  sale of Flat Panel Products through their purchases of products in which Flat Panel Products

22  are components. The defendants' unlawful conspiracy has inflated the prices at which

23  plaintiffs and other indirect purchasers have bought products containing Flat Panel Products

24  as components, and plaintiffs and other indirect purchasers have been injured thereby and

25  paid supracompetitive prices for products containing Flat Panel Products as components.

26      83.    Because defendants control the market for Flat Panel Products, there are

27  virtually no choices for persons and businesses who require products containing Flat Panel

28  Products as components other than buying such products manufactured by a direct

19

1  purchaser that paid supracompetitive prices for Flat Panel Products to defendants because of

2  defendants' conspiracy alleged herein.

3      84.    Unlawful overcharges resulting from price-fixing conspiracies, including that

4  of the defendants herein, almost invariably result in higher prices for products containing

5  the price-fixed component.  A monopoly overcharge at the top of a distribution chain

6  generally results in higher prices at every level below.  If production of a component, such

7  as Flat Panel Products, is monopolized or cartelized, manufacturers of televisions,

8  computers, cell phones, etc., will pay higher prices for Flat Panel Products.  In most cases,

9  they pass along at least part if not all of the price of the price-fixed component to resellers,

10  who in turn charge more to their customers, including consumers buying for their own use,

11  such as the class herein.  Every person at every stage in the chain suffers because of the

12  monopoly price at the top, particularly consumers.  In a multiple-level chain of distribution,

13  such as exists here, passing on monopoly overcharges is the rule, not the exception.  When

14  distribution markets are highly competitive, as they are in the case of products containing

15  Flat Panel Products as components, all or nearly all of the overcharge will be passed

16  through to ultimate consumers, here the class.

17      85.    Hence, the inflated prices of Flat Panel Products resulting from defendants'

18  price-fixing conspiracy have been passed on to plaintiffs and the other class members by

19  direct purchaser manufacturers, distributors, and retailers.

20  ## CONDUCT GIVING RISE TO VIOLATIONS OF LAW

21      86.    During the class period, defendants and their co-conspirators have agreed,

22  combined, and conspired artificially to raise the prices at which Flat Panel Products have

23  been sold in the United States and in the State of California.

24      87.    In December 2006, authorities in Japan, Korea, the European Union and the

25  United States revealed the existence of a comprehensive investigation into anti-competitive

26  activity among TFT-LCD manufacturers.  In a December 11, 2006, filing with the

27  Securities and Exchange Commission, defendant LG.Philips disclosed that officials from the

28  Korea Fair Trade Commission and Japanese Fair Trade Commission had visited the

20

1   company's Seoul and Tokyo offices and that the United States Department of Justice had

2   issued a subpoena to its San Jose office. (<http://www.lgphilipslcd.com/homeContain/

3   jsp/eng/inv/inv101_j_e.jsp?BOARD_IDX+1187&languageSec=E&kinds+IN1>).

4       88.    On December 12, 2006, news reports indicated that in addition to

5   LG.Philips, defendants Samsung, Sharp, Epson Imaging, and AU Optronics were also

6   under investigation. (<http://articles.techrepublic.com.com/2100-10878_11-

7   6142839.html>).

8       89.    According to another news report, a spokeswoman for the U.S. Department

9   of Justice ("DOJ") acknowledged that the DOJ "'is investigating the possibility of

10  anticompetitive practices' and is cooperating with foreign authorities."

11  (<http://www.bloomberg.com/apps/news?pid+newsarchive&sid+aVDgKDZLQkvk>).

12  In an additional report, "Min Chun Hong, an analyst at Goodmorning Shinhan Securities,

13  said that if the companies [Samsung and LG.Philips] were convicted, penalties could

14  amount to about 200 billion won, or $216 million, each."

15  (<http://www.iht.com/articles/2006/12/12/business/_flat.php>).

16      90.    At least one of the defendants has approached the Antitrust Division of the

17  United States Department of Justice to enter into a leniency agreement with respect to the

18  defendants' conspiracy to fix prices of Flat Panel Products. In order to enter into a

19  leniency agreement under the Corporate Leniency Policy of the Department of Justice, a

20  defendant must report the defendants' price-fixing conspiracy to the Department of Justice

21  and confess its own participation in the defendants' price-fixing conspiracy.

22      91.    Since at least 1998, the Flat Panel Product market has not behaved as would

23  be expected of a competitive Flat Panel Product market free of collusion. Rather, the

24  behavior in this market strongly evidences that the defendants engaged in a significant price-

25  fixing conspiracy that had the effect of unnaturally stabilizing, and, in certain instances,

26  dramatically raising prices.

27      92.    After initially being introduced into a market, consumer electronics products

28  and their component parts are typically characterized by steady downward pricing trends.

21

1  However, since at least 1998, the Flat Panel Product market has been characterized by

2  unnatural price stability and certain periods of substantial upward pricing trends.

3  Defendants have achieved this price stability and price increases by agreeing to fix prices

4  and to restrict supply through, among other things, decreases in capacity utilization and

5  expansion rates.

6       93.    Industry analysts have taken note of the unusual trends in Flat Panel Product

7  pricing. For example, during five consecutive quarters in 2003 and 2004, Flat Panel

8  Product prices spiked significantly. One news report indicated that prices for Flat Panel

9  Products used in notebook computers and computer monitors had risen as much as 21-28%

10  during this time period. (< http://www.physorg.com/news872.html >).

11       94.    During this same time period that Flat Panel Products were rising in price,

12  the prices being charged by individual Flat Panel Product manufacturers who are defendants

13  rose by similar amounts. For instance, defendant AU Optronics reported that the price for

14  certain of its Flat Panel Products increased 28 percent between the second quarter of 2003

15  and the second quarter of 2004. Similarly, defendant LG.Philips reported that its pricing

16  increased by 21 percent over the same period.

17       95.    These soaring prices resulted in similarly substantial increases in the profits

18  reaped by the Flat Panel Product manufacturers. For example, the eight largest Flat Panel

19  Product manufacturers reported a collective profit increase of 740 percent between the

20  second quarter of 2003 and the second quarter of 2004. These record profits resulted from

21  defendants' collective action to fix, raise, maintain or stabilize the price of Flat Panel

22  Products.

23       96.    In addition, since at least 1998, the Flat Panel Product market has not

24  followed the basic laws of supply and demand in a competitive market. In a competitive

25  Flat Panel Product market, price increases typically occur during shortage periods. Since at

26  least 1998, however, there have been significant price increases in the Flat Panel Product

27  market during periods of both oversupply and shortage.

28

22

97.     It is generally acknowledged that demand for consumer electronic products and their component parts typically increases steadily over time.  As would be expected, demand for Flat Panel Products was steadily and substantially increasing throughout the Class Period.

98.     For instance, in June 2006, leading technology consulting firm iSuppli Corporation forecast that 2006 shipments of Flat Panel Products used in televisions would reach 46.7 million units, a 74 percent increase from 2005.  According to iSuppli, by 2009, sales of LCD televisions (48%) are expected to surpass sales of CRT televisions (42%) for the first time; and by 2010, LCD televisions will account for a majority (56%) of all televisions sold worldwide.

( < http://www.emsnow.com/newsarchives/archivedetails.cfm?ID + 13338 > ).

99.     The defendants were well aware that demand for Flat Panel Products was steadily and substantially increasing throughout the Class Period.

100.     Defendants took advantage of their knowledge that demand was steadily increasing to manipulate the supply of Flat Panel Products.  This is one of the ways in which defendants conspired to fix prices.  Defendants manipulated supply by, among other things, agreeing to decrease their capacity utilization and refrain from expanding existing capacity.

101.     Because the bulk of Flat Panel Product manufacturers' cost is variable and assembly-related, the price of Flat Panel Products is particularly sensitive to changes in capacity utilization and expansion.  In fact, it is well known that in the Flat Panel Product market, small decreases in capacity utilization have a substantial upward effect on pricing.  Flat Panel Product manufacturers have utilized this knowledge to increase prices through, among other things, restricting supply by decreasing capacity utilization and expansion.

102.     For example, while Flat Panel Product prices were increasing in late 2003, defendants AU Optronics, CMO and HannStar were decreasing capacity utilization.  Similarly, while Flat Panel Product prices were increasing in 2003 and 2004, Flat Panel Product manufacturers' capacity growth rate wa s decelerating.  Defendants' artificial

23

1  supply restriction had the effect of fixing, raising, maintaining, or stabilizing Flat Panel

2  Product prices at artificially high levels.

3      103.   At the same time that defendants were manipulating supply to stabilize and

4  substantially increase prices for Flat Panel Products, their costs to produce these products

5  were decreasing.

6      104.   One of the most significant costs in producing a Flat Panel Product is the cost

7  of its component parts.  Some of the major component parts for a Flat Panel Product

8  include the backlight, color filter, PCB polarizer and glass.  Indeed, for large area Flat

9  Panel Products, the costs of these components comprise over two-thirds of the total cost of

10  production.

11      105.   During the Class Period, the costs of these components as a whole, and

12  individually, have been generally declining, and in some periods at a substantial rate.  Thus,

13  the gap between Flat Panel Product manufacturers' prices and their costs was unusually

14  high during this period.

15      106.   For example, during 2001 and 2002, Flat Panel Product prices increased

16  substantially while the costs to produce these products remained flat or decreased.

17  Similarly, during 2003 to 2004, Flat Panel Product prices again increased by a substantial

18  amount, while costs remained flat or decreased.  This economic aberration is the intended

19  and necessary result of defendants' conspiracy to raise, fix,  maintain or stabilize the prices

20  of Flat Panel Products.

21      107.   Beginning in the year 2000, defendants continually expanded production

22  facilities for Flat Panel Products in order to keep pace with developing technology, which

23  resulted ultimately in at least eight generations of Flat Panel Products.  Each new Flat Panel

24  Product generation was produced from ever larger pieces of glass, so as to reduce the cost

25  of the screens used in televisions, computer monitors, and cell phones.  Increased

26  production capacity in this time period threatened to outstrip demand for Flat Panel

27  Products, with the result that prices of Flat Panel Products should have decreased, but did

28  not.  The reason that prices did not decline was that defendants agreed, combined, and

24

1   conspired during the Class Period to limit their production of Flat Panel Products and their

2   utilization of manufacturing capacity so as to raise, fix, stabilize, and peg the prices of Flat

3   Panel Products.

4       108.    For example, in the spring of 2006, at a conference of manufacturers of Flat

5   Panel Products in Taiwan, Dr. Hui Hsiung, executive vice president of defendant AU

6   Optronics, publicly stated that the defendants should collectively look at cutting back on

7   production from 100 percent to at least 85 percent.  Otherwise, Mr. Hsiung said, if supply

8   outpaced demand, manufacturers would be forced to cut prices.  This was an express

9   invitation to reduce output in order to raise, fix, stabilize, and peg the prices of Flat Panel

10  Products.

11      109.    In June of 2006, Mr. Hsiung, executive vice president of defendant AU

12  Optronics, told the *Wall Street Journal* that AU Optronics had cut production of liquid

13  crystal displays because of bloated inventories, a move that could bring more stability to

14  Flat Panel Product prices by the third quarter if other companies followed suit.  Mr. Hsiung

15  also told the *Wall Street Journal*, "You have to have discipline every month to adjust

16  inventory.  If others follow, that will help prices stabilize by the third quarter."  Mr.

17  Hsiung further said that buildup of Flat Panel Product inventories led to a bigger than

18  expected decline in prices recently.  He urged other Flat Panel Product makers to stop

19  building up inventory during periods of oversupply.  "Supply and demand balance can be

20  maintained during a period of overcapacity if 'fab' loading is reduced by only 5 percent to

21  10 percent," he said, adding that a slight reduction would increase unit fixed costs by only 2

22  percent to 3 percent.  Mr. Hsiung stated that AU Optronics was making efforts to cut

23  manufacturing costs to prevent margin erosion.  He added that further mergers and

24  acquisitions were needed in the Flat Panel Products industry to help stabilize prices.  The

25  foregoing statements were reported by the *Wall Street Journal* on June 15, 2006, in an

26  article entitled "AU Optronics Cuts LCD Output in Bid to Stabilize Falling Prices."  When

27  Mr. Hsiung made these statements to the *Wall Street Journal*, he knew and intended that

28  they would be publicly reported and would become known to all of the defendants; and,

                                                                                    25

1    in making these statement, he intended to send a signal and an invitation to the other

2    defendants to cut production in order to raise, fix, stabilize, and peg prices of Flat Panel

3    Products. Mr. Hsiung made his comments to the *Wall Street Journal* after defendant

4    LG.Philips LCD publicly announced that it was lowering its outlook for the second quarter

5    because of high inventories of Flat Panel Products. President of defendant LG.Philips

6    LCD, Ron Wirahadiraksa, publicly stated on June 12, 2006, that the company would review

7    its capacity plans for 2006. These statements were also signals and an invitation to the

8    other defendants to curtail production of Flat Panel Products and thereby raise, fix,

9    stabilize, and peg prices for Flat Panel Products.

10        110.    Similarly, a November 3, 2005, Samsung presentation, available on its

11    website, stated that "it was possible to secure a reasonable amount of profit while following

12    industry leaders" during the Class Period. (<http://www.samsung.com/AboutSAMSUNG/

13    ELECTRONICSGLOBAL/InvestorRelations/IREventsPresentations/downloads/analyst_200

14    51104_1000.pdf>).

15        111.    Defendants, through their officers, directors and employees, effectuated a

16    contract, combination, trust or conspiracy between themselves and their co-conspirators by,

17    among other things:

18        a.    Participating in meetings and conversations to discuss the prices and

19    supply of Flat Panel Products in the United States and in the State of California;

20        b.    Agreeing to manipulate the prices and supply of Flat Panel Products

21    sold in the United States and in the State of California in a manner that deprived direct and

22    indirect purchasers of free and open competition;

23        c.    Issuing price announcements and quotations in accordance with the

24    agreements reached; and

25        d.    Selling Flat Panel Products to various customers in the United States

26    at fixed, non-competitive prices.

27          **INJURY TO PLAINTIFFS AND COMPETITION**

28        112.    As a direct and proximate result of the conduct of defendants alleged

26

1   hereinabove in fixing prices for Flat Panel Products, competition, consumers, and the

2   plaintiffs and other class members have been injured, in that defendants have artificially

3   restricted the supply of Flat Panel Products and thereby artificially increased prices by

4   agreement; defendants' conduct has artificially r estricted consumer choice; and plaintiffs

5   and other class members have paid higher prices for products containing Flat Panel

6   Products as components than they would otherwise have paid in the absence of defendants'

7   conspiracy.

8                                **VIOLATIONS ALLEGED**

9                                **First Claim for Relief**

10                        **(Violation of Section 1 of the Sherman Act)**

11       113.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and

12   every allegation set forth in the preceding paragraphs of this Complaint.

13       114.   Beginning at a time currently unknown to plaintiffs, but at least as early as

14   January 1, 1998, and continuing through December 31, 2005, the exact dates being

15   unknown to plaintiffs, defendants and their co-conspirators entered into a continuing

16   agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix,

17   stabilize, and peg prices for Flat Panel Products in the United States and in the State of

18   California, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

19       115.   In formulating and carrying out the alleged agreement, understanding, and

20   conspiracy, the defendants and their co-conspirators did those things that they combined and

21   conspired to do, including but not limited to the acts, practices, and course of conduct set

22   forth above, and the following, among others:

23           a.     Fixing, raising, stabilizing, and pegging the price of Flat Panel

24   Products;

25           b.     Submitting rigged bids for the reward and performance of certain Flat

26   Panel Products contracts; and

27           c.     Allocating among themselves and collusively reducing the

28   production of Flat Panel Products.

                                                                              27

116.    The combination and conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the sale of Flat Panel Products has been restrained, suppressed, and/or eliminated in the United States and in the State of California;

b.    Prices for Flat Panel Products sold by defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States and in the State of California; and

c.    Those who purchased Flat Panel Products directly or indirectly from defendants and their co-conspirators have been deprived of the benefits of free and open competition.

117.    Plaintiffs and other class members have been injured and will continue to be injured in their businesses and property by paying more for Flat Panel Products purchased indirectly from the defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy, including paying more for televisions, personal computers, cell phones, and other products in which Flat Panel Products are a component as a result of higher prices paid for Flat Panel Products by the manufacturers of those products.

118.    Plaintiffs and the Class are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief

### (Violation of the California Cartwright Act)

119.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

120.    Defendants' contract, combination, trust or conspiracy was entered in, carried out, effectuated and perfected mainly within the State of California, and defendants' conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

28

121. Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 1998, and continuing thereafter at least up to December 31, 2005, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Flat Panel Products at supracompetitive levels.

122. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Flat Panel Products.

123. For the purpose of forming and effectuating the unlawful trust, the defendants and their co-conspirators have done those things which they combined and conspired to do, including but in any way limited to the acts, practices and course of conduct set forth above and the following:

    a.    Fixing, raising, stabilizing, and pegging the price of Flat Panel Products;

    b.    Submitting rigged bids for the award and performance of certain Flat Panel Products contracts; and

    c.    Allocating among themselves the production of Flat Panel Products.

124. The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    a.    Price competition in the sale of Flat Panel Products has been restrained, suppressed, and/or eliminated in the State of California and throughout the United States;

    b.    Prices for Flat Panel Products sold by defendants and their co-

29

1  conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-

2  competitive levels in the State of California and throughout the United States; and

3        c.     Those who purchased Flat Panel Products directly or indirectly from

4  defendants and their co-conspirators have been deprived of the benefit of free and open

5  competition.

6        125.   As a direct and proximate result of defendants' unlawful conduct, plaintiffs

7  and the members of the Class have been injured in their business and property in that they

8  paid more for Flat Panel Products than they otherwise would have paid in the absence of

9  defendants' unlawful conduct. As a result of defendants' violation of Section 16720 of the

10  California Business and Professions Code, plaintiffs seek treble damages and their cost of

11  suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California

12  Business and Professions Code.

### Third Claim for Relief

### (Violation of the California Unfair Competition Law)

15        126.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and

16  every allegation set forth in the preceding paragraphs of this Complaint.

17        127.   Defendants' business acts and practices were centered in, carried out,

18  effectuated, and perfected mainly within the State of California, and defendants' conduct

19  within California injured all members of the Class throughout the United States. Therefore,

20  this claim for relief under California law is brought on behalf of all members of the class,

21  whether or not they are California residents.

22        128.   Beginning on a date unknown to plaintiffs, but at least as early as January 1,

23  2002, and continuing thereafter at least up through December 31, 2005, defendants

24  committed and continue to commit acts of unfair competition, as defined by Sections 17200,

25  *et seq.* of the California Business and Professions Code, by engaging in the acts and

26  practices specified above.

27        129.   This Claim is instituted pursuant to Sections 17203 and 17204 of the

28  California Business and Professions Code, to obtain restitution from these defendants for

30

1  acts, as alleged herein, that violated Section 17200 of the California Business and

2  Professions Code, commonly known as the Unfair Competition Law.

3    130.    The defendants' conduct as alleged herein violated Se ction 17200. The acts,

4  omissions, misrepresentations, practices and non-disclosures of defendants, as alleged

5  herein, constituted a common, continuous, and continuing course of conduct of unfair

6  competition by means of unfair, unlawful, and/or fraudulent business acts or practices

7  within the meaning of California Business and Professions Code, Section 17200, *et seq.*,

8  including, but not limited to, the following:

9        a.    The violations of Section 1 of the Sherman Act, as set forth above;

10        b.    The violations of Section 16720, *et seq.*, of the California Business

11  and Professions Code, set forth above;

12        c.    Defendants' acts, omissions, misrepresentatio ns, practices, and non-

13  disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the

14  California Business and Professions Code, and whether or not concerted or independent

15  acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

16        d.    Defendants' acts or pra ctices are unfair to consumers of Flat Panel

17  Products in the State of California and throughout the United States, within the meaning of

18  Section 17200, California Business and Professions Code; and

19        e.    Defendants' acts and pr actices are fraudulent or deceptive within the

20  meaning of Section 17200 of the California Business and Professions Code.

21    131.    Plaintiffs and each of the class members are entitled to full restitution and/or

22  disgorgement of all revenues, earnings, profits, compensation, and benefits that may have

23  been obtained by defendants as a result of such business acts or practices.

24    132.    The illegal conduct alleged herein is continuing and there is no indication that

25  defendants will not continue such activity into the future.

26    133.    The unlawful and unfair business practices of defendants, and each of them,

27  as described above, have caused and continue to cause plaintiffs and the members of the

28  Class to pay supracompetitive and artificially-inflated prices for Flat Panel Products.

31

1  Plaintiffs and the members of the Class suffered injury in fact and lost money or property as

2  a result of such unfair competition.

3      134.   The conduct of defendants as alleged in this Complaint violates Section

4  17200 of the California Business and Professions Code.

5      135.   As alleged in this Complaint, defendants and their co-conspirators have been

6  unjustly enriched as a result of their wrongful conduct and by defendants' unfair

7  competition. Plaintiffs and the members of the Class are accordingly entitled to equitable

8  relief including restitution and/or disgorgement of all revenues, earnings, profits,

9  compensation, and benefits that may have been obtained by defendants as a result of such

10 business practices, pursuant to the California Business and Professions Code, Sections

11 17203 and 17204.

**Fourth Claim for Relief**

**(Unjust Enrichment and Disgorgement of Profits)**

14     136.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and

15 every allegation set forth in the preceding paragraphs of this Complaint.

16     137.   Defendants have been unjustly enriched through overpayments by plaintiffs

17 and class members and the resulting profits.

18     138.   Under common law principles of unjust enrichment, defendants should not be

19 permitted to retain the benefits conferred via overpayments by plaintiffs and class members.

20     139.   Plaintiffs seek disgorgement of all profits resulting from such overpayments

21 and establishment of a constructive trust from which plaintiffs and class members may seek

22 restitution.

**PRAYER FOR RELIEF**

24     WHEREFORE, plaintiffs pray:

25     A.     That the Court determine that the Sherman Act, state antitrust law, and state

26 consumer protection and/or unfair competition law claims alleged herein may be maintained

27 as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil

28

32

1   Procedure.

2       B.      That the unlawful conduct, contract, conspiracy or combination alleged herein

3   be adjudged and decreed to be:

4           1.      A restraint of trade or commerce in violation of Section 1 of the

5               Sherman Act, as alleged in the First Claim for Relief;

6           2.      An unlawful combination, trust, agreement, understanding, and/or

7               concert of action in violation of the California state antitrust laws

8               identified in the Second Claim for Relief herein;

9

10          3.      Violations of the California state consumer protection and unfair

11              competition laws identified in the Third Claim for Relief herein; and

12          4.      Acts of unjust enrichment as set forth in the Fourth Claim for

13              Relief herein.

14

15      C.      That plaintiffs and the class recover damages, as provided by federal and

16  California state antitrust laws, and that a joint and several judgment in favor of plaintiffs

17  and the Class be entered against the defendants in an amount to be trebled in accordance

18  with such laws;

19      D.      That defendants, their affiliates, successors, transferees, assignees, and the

20  officers, directors, partners, agents, and employees thereof, and all other persons acting or

21  claiming to act on their behalf or in concert with them, be permanently enjoined and

22  restrained from in any manner continuing, maintaining, or renewing the conduct, contract,

23  conspiracy or combination alleged herein, or from entering into any other conspiracy

24  alleged herein, or from entering into any other contract, conspiracy or combination having a

25  similar purpose or effect, and from adopting or following any practice, plan, program, or

26  device having a similar purpose or effect;

27      E.      That plaintiffs and members of the Class be awarded restitution, including

28  disgorgement of profits obtained by defendants as a result of their acts of unfair competition

33

1   and acts of unjust enrichment;

2         F.      That plaintiffs and members of the Class be awarded pre- and post-judgment

3   interest as provided by law, and that such interest be awarded at the highest legal rate from

4   and after the date of service of the initial complaint in this action;

5         G.      That plaintiffs and members of the Class recover their cost of suit, including

6   a reasonable attorney's fee,  as provided by law; and

7         H.      That plaintiffs and members of the Class have such other, further, and

8   different relief as the case may require and the Court may deem just and proper under the

9   circumstances.

10        Dated: September 17, 2007.

11

12                                          By:

13                                             JAMES M. DOMBROSKI
                                               Attorney for Plaintiffs
14

15

16                              **JURY TRIAL DEMAND**

17        Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a

18   trial by jury for all issues so triable.

19        Dated: September 17, 2007.

20

21                                          By:

22                                             JAMES M. DOMBROSKI
                                               Attorneys for Plaintiffs
23

24

25

26

27

28

1

**PLAINTIFFS' COUNSEL**

2

3  RUSSELL F. BRASSO (No. 85417
   FOREMAN & BRASSO

4  930 Montgomery Street, Suite 600
   San Francisco, CA  94133

5  Telephone:  (415) 433-3475
   Facsimile:  (415) 781-8030

6  Email:  Russell.brasso@foremanandbrasso.com

7  GARY D. McCALLISTER & ASSOCIATES
   Gary D. McCallister

8  Thomas A. Kelliher
   Eric I. Unrein

9  Jamie Goldstein
   120 North LaSalle Street, Suite 2800

10 Chicago, IL 60602
   Telephone: (312) 346-0611

11 Facsimile: (312) 345-0612
   Email: gdm@gdmlawfirm.com

12

13 Gil D. Messina (GM 5079)
   MESSINA LAW FIRM, P.C.

14 961 Holmdel Road
   Holmdel, NJ  07733

15 Telephone:  (732) 332-9300

16 Facsimile:  (732) 332-9301
   Email:  gmessina@messinalawfirm.com

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES FOR ANTITRUST VIOLATIONS